2003 OK 34

**STATE of Oklahoma, ex rel, OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**George L. MOTHERSHED, Respondent.**

**SCBD No. 4687.**

Supreme Court of Oklahoma.

March 18, 2003.

Allen J. Welch, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, for the Complainant.

George L. Mothershed, Respondent, Phoenix, AZ, Pro Se.

WINCHESTER, J.

¶ 1 Oklahoma Bar Association disciplinary proceedings were brought against Respondent attorney, George L. Mothershed, on three counts of professional misconduct. Subsequently, the OBA amended the complaint with five additional counts. Hearings were held before the Professional Responsibility Tribunal, that recommends Respondent be disbarred. Complainant also recommends disbarment.

¶ 2 Respondent is a member of the Oklahoma Bar Association. He was licensed to practice law by the Supreme Court of the State of Oklahoma in 1968. At all times pertinent hereto, Respondent was a resident of the state of Arizona. Respondent sat for the Arizona Bar Exam three times, unsuccessfully, in February 1996, July 1996 and February 1997. He has never been licensed to practice law in the state of Arizona.

*Facts*

¶ 3 Respondent filed pleadings in the Superior Court of the State of Arizona, Maricopa County, in *Copelco Capital, Inc. v. Sports Pocket, Inc. and Brandi Haupt,* CV–97–03283, in June 1997. Respondent identified himself as "Attorney for Defendants" in all pleadings he filed. However, these documents did not indicate Respondent was not licensed to practice law in Arizona. In July 1997, when Respondent appeared for a hearing in this case, the Court determined he had not applied to appear *pro hac vice,* and continued the hearing. Thereafter, Respondent applied to appear *pro hac vice,* stating on his application he was "admitted in Oklahoma." The court granted his application but subsequently, on August 12, 1997, the assigned judge vacated this order. The court also ordered Respondent to return files to the clients and forbade him to further advise or counsel them.

*Arrangement with William White d/b/a White Professional Associates*

¶ 4 On June 30, 1997, the United States Bankruptcy Trustee filed an adversary proceeding against William White, a non-lawyer and proprietor of White Professional Associates, (hereinafter "WPA"), in the United States Bankruptcy Court for the District of Arizona, Adversary No. 97–420. WPA prepared documents to be filed in bankruptcy court. Respondent represented White therein.

¶ 5 In February 1998, the Respondent filed pleadings in the Superior Court of Arizona, Maricopa County in *Bonney v. Bedore, et al.,* CV–98–01771. Again Respondent identified himself as "Attorney for the Plaintiff," but failed to indicate he was not licensed to practice law in Arizona. The pleadings indicated Respondent's State Bar Number was 006472, but did not state that this was his *Oklahoma* Bar Number. Respondent's stationary displayed an Arizona address and "Attorney at Law" but did not specify he was licensed to practice law in Oklahoma, not in Arizona.

¶ 6 On March 6, 1998, the bankruptcy court entered an order that permanently enjoined Respondent's client, White, from preparing bankruptcy petitions and other docu-

ments. This order also enjoined White from receiving, collecting or charging fees for such document preparation and from consulting or giving advice as to bankruptcy laws, forms or procedure. This order provided no avenue for White to prepare documents or collect fees if he worked under the supervision of an attorney.

¶ 7 However, following the issuance of the above-mentioned order, Respondent entered into an arrangement with White pursuant to which White prepared documents for Respondent to file in bankruptcy court, and Respondent compensated White at the rate of fifty dollars per hour, in violation of the March 6, 1998, order. Respondent had not represented debtors in the Arizona bankruptcy court, but began to do so with White's referrals to him. Debtors received solicitation letters from WPA, met with White, received advice and referrals to Respondent. Of the 106 bankruptcy cases filed by Respondent, 102 were referred to him by White.

¶ 8 When the U.S. Trustee became aware of Respondent's conduct, the Trustee initiated adversarial proceedings that resulted in the bankruptcy court's Order of April 26, 2000. Pursuant to this order, Respondent was directed to transfer his files to another attorney or withdraw from his representation of debtors, notify his clients and provide them a copy of the order. Although the bankruptcy court found cause to issue a temporary restraining order against Respondent, it declined to do so because Respondent assured the court he no longer accepted bankruptcy clients. During the hearing before the trial tribunal, the Petitioner presented four witnesses who were Respondent's clients in the Arizona bankruptcy court, to-wit: Roger Wood, Michelle Altherr, Joy Griggs, and Richard and Sybilla Augustine.

### Representation of Roger Wood

¶ 9 One of the clients, Roger Wood, met with White when his mortgage company threatened to foreclose on his residence. White referred him to Respondent as the bankruptcy attorney WPA used. Wood testified at the hearing before the trial tribunal that White "was a representative for Mr. Mothershed" and that the two worked to-gether and shared office space. Wood paid Respondent a $600 retainer to file a bankruptcy action on his behalf. On April 15, 1999, Respondent filed Wood's Chapter 7 bankruptcy petition in the U.S. Bankruptcy Court for the District of Arizona, BR–99–04211–PHX–CGC. He failed to file the required statements and schedules.

¶ 10 Wood produced all requested documents and information to Respondent prior to the one attorney-client conference they had. During the course of this attorney-client relationship, Wood received one telephone call from Respondent, and no written correspondence through the mail. Respondent did not file the required schedules and statements in Wood's behalf. Respondent hand-wrote a note to inform Wood of the time and location of the Section 341 hearing. Respondent also gave Wood his phone numbers and assured him that he would attend the hearing. However, Respondent did not attend, and failed to inform Wood or the bankruptcy court that he would not attend. In fact, the location contained in Respondent's handwritten note to Wood was actually a vacant lot, and not the bankruptcy court's address. When Wood finally arrived at the Section 341 hearing, his case had been dismissed. The bankruptcy court entered its order of dismissal on May 24, 1999. Wood's repeated attempts to contact Respondent by telephone were to no avail.

¶ 11 Respondent's misconduct prejudiced Wood. His home was taken in foreclosure proceedings, and he was forced to hire another attorney for an additional fee of $600.00, to re-file his bankruptcy case. The second attorney successfully represented Wood and his debts were discharged. Respondent misrepresented facts to the Office of General Counsel in his December 2000, response to Wood's grievance against him. Respondent represented that he filed a second Chapter 7 petition at no additional cost, *pro se,* and that he filed all completed schedules. He also contended he returned Wood's telephone calls. These representations are contrary to the facts in the instant case.

### Representation of Michelle Altherr

¶ 12 Michelle Altherr and her husband were referred to Respondent by Ray Arm-

bruster of WPA, after receiving a solicitation letter related to the potential foreclosure of their home. In June 1999, the Altherrs paid Respondent a $775 retainer to file bankruptcy on their behalf. Respondent assured them it "would be an easy case." He requested information and documents from the Altherrs, which Ms. Altherr delivered to WPA three days later. On July 30, 1999, Respondent filed a Chapter 7 bankruptcy action on behalf of the Altherrs in the U.S. Bankruptcy Court for the District of Arizona. However, he did not file the schedules and statements contemporaneously. Within days, the Altherrs received a notice from the U.S. Trustee that requested the same documents Ms. Altherr previously had delivered to Respondent. When she telephoned Respondent to inquire about the notice, he stated he had taken care of everything.

¶ 13 On August 26, 1999, the court dismissed the Altherr's bankruptcy petition for failure to file schedules and a statement of affairs. They learned of the dismissal when they telephoned the court to inquire about it. When Ms. Altherr called Respondent to discuss the dismissal, he told her he would talk to White. She assumed Respondent would handle the matter and call her back.

¶ 14 In September 1999, the Altherrs went to WPA's office and signed the necessary paperwork to file a second bankruptcy. Subsequently, White and Respondent stated they had filed a second bankruptcy and the Altherrs would receive notice of a Section 341 hearing soon. The Altherrs became concerned when a stranger tacked a motion and summons concerning an action for foreclosure to their front door, then photographed it. When the Altherrs telephoned Respondent, he again told them not to worry, that he had filed the second bankruptcy.

¶ 15 On December 16, 1999, Respondent filed a Motion to Reinstate the first bankruptcy, along with the requisite schedules and statements. Respondent's Disclosure of Compensation of Attorney for Debtor falsely reflects the Altherrs had not paid his attorney's fees at the time of filing. Ms. Altherr spoke with Respondent the following day, and he admitted the second bankruptcy had not been filed in September, blaming the oversight on White. Respondent stated he had terminated his arrangement with White because of similar problems. Respondent also stated he had filed the necessary papers to reinstate the first bankruptcy and that the Altherrs need not appear at the court date noticed in the foreclosure pleadings. Respondent again assured them he would "take care of it." The Altherrs then paid Respondent an additional $130 to have the bankruptcy reinstated.

¶ 16 In an order filed April 26, 2000, the Respondent was ordered to "expeditiously transfer his open bankruptcy files to another attorney . . . or withdraw from representation of debtors in those cases." The order also instructed the Respondent to notify his clients of the order and to send them a copy thereof. The order also stated the court found cause to issue a temporary restraining order against the Respondent prohibiting him from accepting new bankruptcy cases. But, based on Respondent's avowal to the court on April 18 that he was no longer taking or accepting new bankruptcy clients, the court chose not to issue the restraining order.

¶ 17 On January 4, 2000, the court denied Respondent's Motion for Reinstatement because he did not provide a reason why the missing documents were not filed promptly, along with a request for reinstatement, after the case was dismissed on August 26, 1999. Ten days later, the court entered an Order to Pay Reopening Fee and vacated the order denying the Respondent's Motion to Reinstate. Respondent told the Altherrs they need not appear at the Section 341 hearing scheduled for January 31, 2000, because it would be rescheduled. However, it was not rescheduled and the Altherrs and Respondent failed to appear.

¶ 18 Respondent neglected to inform his clients or the court that he would not appear. On February 22, 2000, the court entered an order dismissing the Altherr bankruptcy case because no one had appeared at the Section 341 hearing. Again, Respondent failed to inform his clients that their case had been dismissed. The Altherrs learned of this development when they received an Order from the bankruptcy court advising them of the

dismissal due to their failure to appear at the Section 341 hearing. When they telephoned Respondent, he promised he had "spoken with the Trustee and that it had been taken care of." The Altherrs believed the problem was resolved and expected notice of a second Section 341 hearing.

¶ 19 On March 2, 2000, Respondent filed a Motion to Reinstate the Altherr bankruptcy. On March 10, he told the Altherrs a hearing to reinstate their bankruptcy was scheduled for April 7, 2000. He again informed them that they need not attend, and on April 5, 2000, the court denied the Motion to Reinstate and directed that if the bankruptcy was refiled, it would be assigned to the same judge. Respondent informed the Altherrs their bankruptcy petition could not be reinstated and must be re-filed. He failed to tell them it had been dismissed April 27, 2000. Over the next few months, Respondent offered his clients various explanations as to why he had not prepared the necessary forms for re-filing.

¶ 20 On July 11, 2000, the Respondent informed the Altherrs the forms were prepared and ready for their review and signature. They picked them up and returned the signed copies to Respondent within a few days, with the understanding their bankruptcy would immediately be re-filed. As of August 1, 2000, Respondent still had not filed the Altherrs' bankruptcy or returned any of their multiple phone calls. On that day, the Altherrs retrieved their file from WPA Associates. They never spoke with him again.

¶ 21 Respondent's misconduct prejudiced the Altherrs. Their residential mortgage was foreclosed, forcing the couple and their child to vacate their home and move into an apartment.

### Representation of Joy Griggs

¶ 22 Joy Griggs was another bankruptcy client of Respondent who was referred to him by Ray Armbruster, after receiving correspondence from WPA regarding a threat of mortgage foreclosure on her home. Griggs and her father met with Respondent on October 4, 1999, and she paid him a $1060.00 retainer to file a bankruptcy action on her behalf. Respondent assured her she would keep her home and informed her that a Chapter 13 reorganization would allow her to become current on her mortgage payments and the arrearage, and thereby retain her residence.

¶ 23 On October 6, 1999, Respondent filed a Chapter 13 bankruptcy on behalf of Griggs in the U.S. Bankruptcy Court for the District of Arizona. On November 16, 1999, Chase Mortgage Company, who held the mortgage on Griggs' residence, filed an objection, to which Respondent never filed a response.

¶ 24 Respondent advised Griggs she needed to attend a Section 341 hearing on November 17, 1999, and that he would be in attendance. However, Respondent failed to appear and did not inform the court or his client he would not appear. Griggs proceeded with the Section 341 hearing without the benefit of legal counsel. Following the missed hearing, Griggs attempted to contact Respondent many times, calling him "several times a day for several days." She estimated she left ten to twenty messages Respondent failed to acknowledge.

¶ 25 On February 18, 2000, the U.S. Trustee filed a recommendation directing the Respondent to take action responsive to the concerns raised by Chase Mortgage Company. The recommendation warned that if compliance with the Trustee's recommendation and an order confirming plan were not received by March 15, 2000, the Trustee would lodge an Order of Dismissal with the court. This recommendation was mailed to both Respondent and Griggs. Respondent called Griggs and requested she provide him with various income and financial documents he had not previously requested. On March 3, 2000, Griggs provided the requested documentation (approximately ten days after it was requested by the Respondent.) However, Respondent never filed a response to the Trustee's Recommendations.

¶ 26 On April 10, 2000, Respondent telephoned Griggs to inform her the U.S. Trustee recommended dismissal of her bankruptcy and it would be necessary to re-file. He told Griggs he had written the court a letter about his delay in responding to the court's demand for more documentation, but the

court had ignored his letter. After a request from Respondent, Griggs delivered documentation to his office on April 12, 2000. In her testimony, Griggs stated she provided duplicate documentation to Respondent a minimum of three times. At this meeting on April 12, 2000, Respondent informed Griggs he could no longer represent her due to a conflict of interest. The following day, Respondent telephoned Griggs and said her house would be up for sale on April 25. She has not heard from Respondent since.

¶ 27 On April 26, 2000, an order was entered dismissing Griggs' bankruptcy because Respondent never provided the requested documentation. Griggs was prejudiced by Respondent's misconduct. She lost her residence in foreclosure proceedings, and she and her children were forced to move in with her father.

### Representation of Richard and Sybilla Augustine

¶ 28 In November 1998, Richard and Sybilla Augustine met with an agent of WPA after receiving mail regarding a threat of foreclosure on their home. The WPA agent referred them to Respondent, saying bankruptcy was the only option. They paid a $900.00 retainer to Respondent, to file a bankruptcy action on their behalf. Respondent assured them a Chapter 13 reorganization would allow them to become current on their mortgage payments and arrearage, and thereby retain their residence.

¶ 29 According to Mrs. Augustine's testimony, Respondent told them the bankruptcy court would discharge her husband's $27,157.50 child support arrearage, unless his former wife filed an objection. Mrs. Augustine also testified Respondent told them they could avoid future child support collection efforts by changing Mr. Augustine's social security number.

¶ 30 On December 1, 1998, Respondent filed a Chapter 13 bankruptcy on behalf of the Augustines in the U.S. Bankruptcy Court for the District of Arizona. Respondent did not file the requisite schedules and statements until December 18, 1998. The child support arrearage was listed in the bankruptcy schedules. On December 22, 1998,

Respondent filed a Chapter 13 Plan which did not list the child support arrearage. The Plan made no mention of, or payment proposal regarding, that arrearage. Respondent's oversight was not discovered until after the Plan was confirmed. By letter dated May 2, 2000, the U.S. Trustee advised Respondent that the plan did not address the $27,150.50 child support claim.

¶ 31 On May 16, 2000, Respondent filed a Motion to Withdraw from the bankruptcy. The Motion stated that the debtors had agreed to discontinue the attorney-client relationship. The Augustines were unaware Respondent intended to withdraw until they received this motion in the mail.

¶ 32 Respondent's failure to include the child support arrearage in the Chapter 13 Plan resulted in a $9,556 shortfall that prohibited the plan's confirmation. As a result, Chapter 13 reorganization became unavailable to the Augustines. On May 30, 2000, the court dismissed the Augustine's bankruptcy because they were delinquent in their Plan payments.

¶ 33 On April 17, 2001, the Supreme Court of Arizona publicly censured Respondent for, *inter alia,* the misconduct cited above. *See, In the Matter of Mothershed,* Supreme Court No. SB–01–0076–D, 2001 Ariz. LEXIS 63. Public censure serves as the harshest penalty the Arizona Supreme Court may impose on a person not a member of the Arizona Bar Association.

¶ 34 In May 1998, the OBA opened a General Counsel's investigation as a consequence of the Arizona Bar Association investigation. On May 13, 1998, OBA General Counsel Dan Murdock wrote Respondent a letter requesting him to respond within twenty days to allegations of possible unlawful practice of law in Arizona. Respondent failed to respond within the time set forth. On June 11, 1998, Respondent mailed a one-page letter to Mr. Murdock that did not address the allegations and threatened suit against the OBA. Respondent mailed Murdock a second letter dated June 19, 1998, which again failed to address the allegations. On August 6, 1998, Murdock advised Respondent by letter that his responses did not satisfy the require-

ments of Rule 5.2, RGDP, and advised him of the deadline to supplement his response. Respondent never addressed the allegations brought against him.

### Enhancements

¶ 35 Respondent displayed a calculated indifference or hostility toward this proceeding since his initial Answer filed with the Court on February 19, 2002, wherein he threatened the members of the Supreme Court in this matter:

"... to prevent this Court, its members, Petitioner, and it's (sic) Prosecutors becoming embroiled in litigation in Arizona this Court should abstain from further proceedings herein and possible substantial personal civil liability and damages."

¶ 36 Respondent has made multiple similar threats against the Court, the Trial Panel, and Complainant's witnesses. He illustrated his contempt for the disciplinary process, this proceeding and this Court by ignoring orders of the Presiding Master, failing to appear for witness depositions and refusing to respond to proposed Stipulations.

¶ 37 On April 16, 1991, the Supreme Court of Oklahoma entered an Order publicly cen-

suring Respondent. *See, OBA v. Mothershed,* 1991 OK 36, 812 P.2d 382. The Court found on two occasions, Respondent gave conflicting testimony under oath, "only one of which could reasonably have been believed by the speaker to have been the complete truth." The Court also found it noteworthy that Respondent states he does not practice law.

¶ 38 Respondent's failure to disclose that he was not a member of the Arizona Bar, and had not been admitted *pro hac vice* in pleadings filed with that court constitute false statements of fact to the tribunal in violation of Rule 3.3(a)(1), ORPC [1]. Furthermore, Respondent's failure to disclose jurisdictional limitations is a misrepresentation which violates Rule 4.1(a) [2] and Rule 7.1(a)(1) ORPC [3]. By filing pleadings in a state court where he was not licensed and giving legal advice, Respondent engaged in the unauthorized practice of law, a violation of Rule 5.5(a), ORPC [4].

¶ 39 Respondent's conduct in dealing with the OBA and General Counsel violate Rule 5.2, RGDP [5]. Respondent assisted

1.  Rule 3.3(a)(1) states:

    "(a) A lawyer shall not knowingly:
    (1) make a false statement of fact or law to a tribunal;"

2.  Rule 4.1(a) states:

    "In the course of representing a client a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person;"

3.  Rule 7.1(a)(1)states:

    "(a) A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it is:
    (1) a communication which contains a material misrepresentation of fact or law, or omits information necessary to make the communication, considered as a whole, not materially misleading;"

4.  Rule 5.5(a) states:

    "A lawyer shall not:
    "(a) practice law in a jurisdiction where doing so violates the regulation of the legal profession in that jurisdiction."

5.  Rule 5.2 states:

    "After making such preliminary investigation as the General Counsel may deem appropriate, the General Counsel shall either (1) notify the person filing the grievance and the lawyer that the allegations of the grievance are inadequate, incomplete' or insufficient to warrant the further attention of the Commission, provided that such action shall be reported to the Commission at its next meeting, or (2) file and serve a copy of the grievance (or, in the case of an investigation instituted on the part of the General Counsel or the Commission without the filing of a signed grievance, a recital of the relevant facts or allegations) upon the lawyer, who shall thereafter make a written response which contains a full and fair disclosure of all the facts and circumstances pertaining to the respondent lawyer's alleged misconduct unless the respondent's refusal to do so is predicated upon expressed constitutional grounds. Deliberate misrepresentation in such response shall itself be grounds for discipline. The failure of a lawyer to answer within twenty (20) days after service of the grievance (or recital of facts or allegations), or such further time as may be granted by the General Counsel, shall be grounds for discipline. The General Counsel shall make such further investigation of the grievance and response as the General Counsel may deem appropriate before taking any action."

White in giving legal advice and preparing pleadings, a violation of Rule 5.5(b), ORPC [6]. By hiring White to perform services, Respondent knew were a violation of the bankruptcy court's March 6, 1998, order, Respondent violated Rule 8.4(d) ORPC [7]. Violation of these rules constitutes grounds for professional discipline.

¶ 40 Respondent's conduct in failing to properly represent his clients and keep them informed violated Rules 1.1 [8], 1.3 [9], 1.4 [10], 1.16(d) [11] and 8.4(c) ORPC [12] and constitutes grounds for professional discipline.

¶ 41 Rule 5.4, Rules Governing Disciplinary Proceedings, 5 O.S. ch. 1, app. 1–A (1997 Supp.) provides that the "threat of litigation by a respondent lawyer against a person filing a grievance by reason of such filing may be grounds in itself for discipline." In addition, Respondent's contempt and lack of respect toward the Court and the disciplinary process serve to enhance discipline.

¶ 42 Consideration of prior discipline serves to aid the Court in making its decision, *OBA v. Minter*, 1998 OK 59, 961 P.2d 208. Respondent's prior discipline serves to enhance any discipline to be imposed in this proceeding, Rule 6.2, RGDP [13].

¶ 43 This Court has repeatedly emphasized that the purpose of disciplinary proceedings is not to punish the attorneys involved, but to protect the public. This need is clearly evident in the case at hand. Respondent's actions not only tarnish the image of all Oklahoma attorneys, but resulted in severe financial hardships for his clients. Several of Respondent's clients might have retained their homes had they retained counsel other than the Respondent. Through witness testimony, evidence and the actions of Respondent himself, the Complainant has established by clear and convincing evidence that Respondent, George L. Mothershed, has multiple violations of the rules of professional conduct. Therefore, Respondent is hereby disbarred and assessed the costs of this proceeding, in the amount of $6,919.08, to be paid within 90 days of the date of this order.

**RESPONDENT IS HEREBY DISBARRED AND ASSESSED COSTS.**

6. Rule 5.5(b) states:
   "A lawyer shall not: (b) assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law."

7. Rule 8.4(d) states:
   "It is professional misconduct for a lawyer to: (d) engage in conduct that is prejudicial to the administration of justice."

8. Rule 1.1 states:
   "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation."

9. Rule 1.3 states:
   "A lawyer shall act with reasonable diligence and promptness in representing a client."

10. Rule 1.4 states:
    "(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
    (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

11. Rule 1.16(d) states:
    "(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law."

12. Rule 8.4(c) states:
    "It is professional misconduct for a lawyer to: (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;"

13. Rule 6.2 states:
    "The complaint shall set forth the specific facts constituting the alleged misconduct, and if prior conduct resulting in discipline, or evidence from prior investigations, is relied upon to enhance discipline, the prior acts or conduct relied upon shall be set forth."

WATT, C.J., OPALA, V.C.J., HODGES, LAVENDER, HARGRAVE, KAUGER, BOUDREAU, JJ., concur.

SUMMERS, J., not participating.